IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ANNA MARIE JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:15-cv-103-WC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Anna Marie Johnson ("Plaintiff"), filed an application for disability insurance benefits under Title II of the Social Security Act ("the Act"), and Plaintiff protectively filed an application for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 401 *et seq.* Her applications were denied at the initial administrative level.  Plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ").  Following the hearing on January 9, 2013, the ALJ issued a decision finding Plaintiff not disabled from the alleged onset date of November 17, 2010, through the date of the decision, August 20, 2013. (R. 30, 42). The Appeals Council denied Plaintiff's request for review. (R. 2). The ALJ's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner").[1] *See Chester v. Bowen,* 792 F.2d 129, 131 (11th Cir. 1986). Judicial review proceeds pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 636(c).  After careful scrutiny of the record and briefs, for the reasons herein explained, the Court AFFIRMS the

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

Commissioner's decision.

## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to benefits when the person is unable

to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).[2]

To make this determination, the Commissioner employs a five-step, sequential evaluation

process.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2011).

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 [the Listing of Impairments]?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?
An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

The burden of proof rests on a claimant through Step 4.  *See Phillips v. Barnhart*, 357 F.3d

1232, 1237-39 (11th Cir. 2004). A claimant establishes a *prima facie* case of qualifying disability

---

[2]A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

[3] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986), is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981).

once they have carried the burden of proof from Step 1 through Step 4.  At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform.  *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC").  *Id.* at 1238-39. The RFC is what the claimant is still able to do despite the claimant's impairments and is based on all relevant medical and other evidence.  *Id.*  It may contain both exertional and nonexertional limitations.  *Id.* at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform.  *Id.* at 1239.  To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or call a vocational expert ("VE").  *Id.* at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Phillips*, 357 F.3d at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."  *Id.*

The court's review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  Substantial evidence is more than a scintilla, but less than a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

---

[4] *See* 20 C.F.R. pt. 404 subpt. P, app. 2.

(quotation marks and citation omitted); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004) ("'Even if the evidence preponderates against the Commissioner's findings, [a reviewing court] must affirm if the decision reached is supported by substantial evidence.'") (alteration added).   A reviewing court may not look only to those parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings. . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam).

## III.   ADMINISTRATIVE PROCEEDINGS

Plaintiff was 26 years old on the alleged onset date and 28 years old at the time of the hearing before the ALJ. (R. 51.) The ALJ found Plaintiff has no past relevant work, and that, therefore, transferability of jobs was not an issue because Plaintiff has no past relevant work. (R. 40). Plaintiff has at least a high school education and can communicate in English. (R. 40). Following the administrative hearing and employing the five-step process, the ALJ found at Step One that Plaintiff "has not engaged in substantial gainful activity since November 17, 2010, the alleged onset date." (R. 32). At Step Two, the ALJ found that Plaintiff suffers from severe impairments of "chronic pain syndrome, herniated, bulging discs in the lumbar spine, lumbar radiculitis, spinal stenosis, with encroachment of the neuroforamina, endometriosis, degenerative joint disease, polyarthralgia, fibromyalgia, lumbago, sciatica, depression, attention deficit disorder, and anxiety." (R. 32). The

4

ALJ then found at Step Three that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (R. 33). Next, the ALJ found that Plaintiff has the RFC to perform light work with additional limitations. (R. 34, 40). Following the RFC determination, the ALJ found at Step Four that Plaintiff has no past relevant work. (R. 40). At Step Five, the ALJ found that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity," and after consulting with the VE, "there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.1569, 404.1569(a), 416.969, and 416.969(a))." (R. 41). The ALJ identified the following occupations as examples: "Document preparer," "Leaf tier," and "Telephone quotation clerk."[5] (R. 41). Accordingly, the ALJ determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 17, 2010, through the date of th[e] decision (20 CFR 404.1520(g) and 416.920(g))." (R. 42).

## IV.   PLAINTIFF'S CLAIMS

Plaintiff presents two issues for this court's consideration in review of the Commissioner's decision: (1) "the Appeals Council erred in failing to remand [Plaintiff's] case in light of new and material evidence which rendered the ALJ's denial of benefits erroneous," and (2) the ALJ failed to properly apply the applicable three-part pain standard. Pl.'s Br. (Doc. No. 12), at 3.

## V.   DISCUSSION

### A.   *Whether the Appeals Council Erred*

"[T]he Appeals Council 'must consider new, material, and chronologically relevant evidence'

---

[5]These jobs are actually rated as sedentary, unskilled work. (R. 41, 83-84).

that the claimant submits." *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1320 (11th Cir. 2015) (per curiam) (citing *Ingram v. Comm'r of Soc., Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007), 20 C.F.R. §§ 404.970(b), 416.1470(b)). Evidence is chronologically relevant when it relates to the period on or before the date of the ALJ's decision. *See* 20 C.F.R. §§ 404.970(b), 416.1470(b). The "evidence is material, and thus warrants a remand, if 'there is a reasonable possibility that the new evidence would change the administrative outcome.'" *Flowers v. Comm'r of Soc. Sec.*, 441 F. App'x 735, 745 (11th Cir. 2011) (quoting *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987)). The Appeals Council must show that it adequately considered the new evidence, and it is sufficient if the Appeals Council states it considered the new evidence. *See Mitchell v. Comm'r, Soc. Sec. Admin*, 771 F.3d 780, 783 (11th Cir. 2014); *see also Atha v. Commissioner, Social Sec. Admin.*, 616 F. App'x 931, 935 (11th Cir. 2015). On the other hand, if the Appeals Council "perfunctorily adheres to the ALJ's decision, the Commissioner's findings are not supported by substantial evidence." *Caces v. Comm'r, Soc. Sec. Admin.*, 560 F. App'x 936, 941 (11th Cir. 2014).

Plaintiff argues the Appeals Council erred by failing to remand the case in light of one-time consultative examinations by Richard Meadows, D.O., and Fred George, Ph.D. Pl.'s Br. (Doc. No. 12), at 3-4. On September 10, 2013, about three weeks after the ALJ ruled against awarding benefits, Plaintiff underwent a consultative examination with Dr. Meadows, (R. 17), and on September 24, 2013, she underwent a consultative examination with Dr. George. (R. 12).

The Appeals Council "looked at" the evidence Plaintiff submitted, and it ruled that it was information about a time after the date of the ALJ's decision on August 20, 2013, and therefore did not affect the decision whether Plaintiff was disabled before August 20, 2013. (R. 2). The Appeals Council informed Plaintiff that if she wanted the Commissioner to consider the evidence, Plaintiff

6

would need to file a subsequent application for benefits. (R. 2).

Plaintiff argues the evidence is chronologically relevant because Dr. Meadows gave his opinion less than a month after the ALJ's decision, because Dr. George's opinion was just over a month after the ALJ's decision, and no intervening event or deterioration in Plaintiff's condition occurred between the time of the ALJ's decision and the medical opinions. Pl's Br. (Doc. No. 12), at 10-11. Plaintiff further argues the opinions concern the same ADHD, anxiety, depression, back pain, degenerative disc disease, rheumatoid arthritis, hand swelling and morning stiffness that Plaintiff presented to the ALJ, and Dr. George reviewed and considered Plaintiff's prior medical records concerning the time relevant to the ALJ's decision. Pl's Br. (Doc. No. 12), at 10-11; (R. 15). Finally, Plaintiff argues the ALJ erred when he said he gave great weight to the state agency opinion because the state agency physician indicated that he did not have enough evidence on which to base an opinion. Pl.'s Br. (Doc. No. 12), at 12; (R. 40, 94, 101). Thus, Plaintiff argues, the ALJ did not have sufficient evidence to decide Plaintiff's case, the opinions of Drs. Meadows and George were the only opinions regarding Plaintiff's ability to perform work functions, and the additional material would have been helpful to deciding her case. Pl.'s Br. (Doc. 12), at 11-12.

1.    **The ALJ's Physical RFC Assessment**

The ALJ found that Plaintiff has the RFC to perform light work with the following limitations: "unable to push or pull leg controls. She can rarely bend or squat and she cannot crawl, crouch or bend at all. She should be allowed to alternate between sitting and standing occasionally at her work station. In addition, the claimant cannot perform work requiring public interaction. She must avoid unprotected heights, as well as dangerous moving machinery. The claimant has deficits concentrating and maintaining pace, which could cause her to be off task approximately 5% of the

workday." (R. 34). The ALJ ruled:

> In accordance with Social Security Ruling 96-6p, the undersigned has *considered the administrative findings of fact made by State agency medical physicians and other consultants.* The opinions are weighed as statements from non-examining expert sources. Based on the evidence, the undersigned concludes the State agency adequately considered the evidence of record and *great weight is given to the opinions.* More specifically, these opinions are consistent with the treatment notes and objective record at Exhibits 3F, 4F, and 19F indicating that the claimant is thin and fit patient who should do well with her degenerative disc at L4-L5 and mild antalgic gait. The notes additionally indicate that her plain films neurologic test were normal; the workups for connective-tissue disease had not been productive, with negative RA factor, negative ANA, and normal sedimentation rate. In addition, the claimant's testimony regarding her generally active daily routine is also supportive of the State agency opinions.
>
> In sum, although the claimant has severe medically determinable impairments that limit her functionality, the above residual functional capacity is supported by her testimony regarding fairly active daily activities, including taking care of her personal needs, as well as her daughter's needs; doing laundry; preparing meals; performing household chores; going grocery shopping, and; driving. In addition, the conservative treatment which she has received, including no hospitalizations or recent ER visits, and the relative lack of any recent treatment are also supportive of the above residual functional capacity. All of the above reveals that the claimant would not be precluded from performing within the above residual functional capacity.

(R. 40) (emphasis added).[6]

The ALJ stated, and the medical records support, that through May 2011 Plaintiff's physical

---

[6]Plaintiff points out that the ALJ erred in stating that the State agency opinions were consistent with the record and entitled to great weight, Pl.'s Br. (Doc. No. 12), at 11-12, because the State agency physician, Robert Estock, M.D., indicated he lacked sufficient evidence to render an opinion regarding Plaintiff. (R. 94, 101). For reasons explained infra, however, the court concludes the ALJ's error was harmless. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (ALJ's erroneous factual findings were harmless when they did not impact the ultimate finding that the claimant was not disabled). Here, the ALJ considered all the evidence in the record, including that from Plaintiff's treating physicians, and the medical evidence showed that Plaintiff had "'relatively little physical impairment'" and the ALJ could "'render a commonsense judgment about functional capacity even without a physician's assessment.'" *Castle v. Colvin*, 557 F. App'x 849, 854 (11th Cir. 2014) (quoting *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)); *cf. Whitt v. Colvin*, 2014 WL 3756340, at *4 (M.D. Ala. July 30, 2014) (there is no mandatory requirement that an ALJ secure an RFC assessment by a medical provider) (citing cases).

examinations showed generally normal findings except for treatment of ongoing back pain and muscle spasms. (R. 37-38, 299-305). In 2007, Plaintiff underwent a medical procedure to address her endometriosis. (R. 223-24). Gynecologist James W. Leach, M.D., last saw Plaintiff on November 18, 2008, and he gave the opinion that Plaintiff "demonstrated no physical or mental disability at that time." (R. 213).

The medical records show Plaintiff's treatment for back pain began at Prime Med in April 2010. (R. 37, 265). Plaintiff's treatment notes from May 17, 2010, indicate she was taking Xanax for anxiety (R. 280). She was recommended to have x-rays and physical therapy. (R. 281). On June 16, 2010, she was prescribed Ultram and physical therapy. (R. 284). On June 28, 2010, Plaintiff was assessed with anxiety and an MRI of her lumbar spine was ordered. (R. 287). Notes from a radiology report from D.J. Terrell, M.D., on July 20, 2010, indicate MRI tests showing disc herniation in Plaintiff's L4-L5 with minimal spinal stenosis and encroachment bilaterally on the neuroforamina. (R. 246). On July 29, 2010, Plaintiff was prescribed physical therapy and hydrotherapy, Diclofenac, Mobic, Ultram, and muscle relaxers. (R. 292-94). On August 15, 2010, Plaintiff reported her medication was stolen and she had two refills of Ultram. (R. 296). The notes from that day indicate generally normal findings. (R. 296-98).

On March 8, 2011, Plaintiff was seen at Prime Med for complaints of back pain. (R. 299). Her gait was normal, but she was assessed with low back pain, and ease of flexion in her lower back severely reduced due to muscle spasms and 9/10 lower back pain. She was referred for a possible epidural and physical therapy; her previous medications were continued; and she was prescribed Ibuprofen, Neurontin, Ultram, and Xanax. (R. 301).

On April 25, 2011, Plaintiff presented to Southern Bone and Joint for lower back pain,

hernia, skin muscle pain; she could not sit or lay for a long period; and she had "body shakes, nerves." (R. 251). The notes from J. Paul Maddox, M.D., on that date indicate Plaintiff had low back pain over the sacroiliac joint and was not taking antiinflammatories other than Ibuprofen. (R. 256). He indicated he would give her a left SI and right hip bursal injection and recommended a lumbar epidural. (R. 256). He suggested a trial of Mobic, physical therapy, and aggressive efforts on Plaintiff's "own front to improve her function" with knee stretching, less pain behavior and more of an active approach to expecting improvement. He wrote, "[s]he is a thin, fit patient who should do well wit[h] her back. She has a degenerative disc L4-5 and apparently some mild crowding," "[h]er plain films were normal and her neurologic was normal." (R. 256).

On May 3, 2011, Plaintiff received an epidural injection in her lumbar area at Flowers Hospital. (R. 316-27). Her physical examination reported a "[w]ell-developed, very thin female, in moderate distress." (R. 321). Her neurologic report was "[g]rossly normal. No weakness in her lower extremities one compared to the other. The patient ambulates well." (R. 321). She tolerated the procedure well and "was discharged in satisfactory condition after an uneventful recovery." (R. 322).

On May 9, 2011, Plaintiff went to Dale Medical Center for physical therapy in connection with her lumbar and right hip pain. (R. 247-48). The notes indicate Plaintiff "is an excellent candidate for conservative care using manual therapy." (R. 247). As the ALJ indicated, the notes show Plaintiff had a shortened leg, mild antalgic, stiffened gait; highly tender bilateral hip flexors; and generalized hypertonicity in the gluteals along the sacrum bilaterally, left piriformis, IT band, hamstrings, and quadriceps.(R. 37, 247). Notes on her range of motion indicate she had shortened quadriceps by 20 to 30 degrees in prone knee flexion; and in prone position Plaintiff tolerated with supported waist, elbow propping, and partial extension press-ups for passive spinal extension; and

prone bilateral leg left without radiating pain. (R. 247). She had gross abdominus weakness and decreased bilateral hip abductor/extensor strength, and her sensation was unimpaired to light touch in the lower extremities and the lumbar region. (R. 247). She was ambulating with no gross loss of balance; she was alert and oriented to time, place, and situation; and she was agreeable to the plan of care. (R. 248). The medical record, as the ALJ acknowledged, (R. 38), does not include other physical therapy.

During a visit to Prime Med on May 10, 2011, Plaintiff complained only of pain and backache. (R. 304). She indicated that her physical therapy was ongoing, (R. 305), but Plaintiff reported in December 2011 that she did not complete physical therapy because it was too painful (R. 278, 395). During her May 10, 2011, visit, she was prescribed Ibuprofen, Ultram, and Zanaflex and asked to return in three months. (R. 305).

On June 7, 2011, Plaintiff saw Dr. Maddox at Southern Bone and Joint. (R. 255). Plaintiff's biggest complaint was back pain, though she reported occasionally having right leg pain and numbness, and her epidural and medications were not giving her relief. (R. 255). Dr. Maddox said she was difficult to assess, as she was "somewhat hypersensitive to pain." (R. 255). He recommended another epidural at a different location unless the trigger point injections helped significantly. (R. 255).

On August 9, 2011, Plaintiff returned to Prime Med for complaints of frequent headaches; change in vision; abdominal pain; muscle pain, weakness, joint swelling, backache, degenerative disease; numbness/tingling; and nervousness, mood changes, and depression. (R. 268-69). Her physical, neurological, and psychological exam showed essentially normal findings, but she was assessed with anxiety and low back pain. (R. 270). Her medications for Ibuprofen, Ultram, and

Zanaflex were refilled, and she was referred to a psychiatrist for depression and anxiety. (R. 270).

On September 26, 2011, Plaintiff saw Dr. Maddox with complaints of back pain and also significant leg pain radiating down both legs. (R. 254). Dr. Maddox wrote that Plaintiff's "description of her symptoms is somewhat unclear, but she is significantly affected by this and is teary throughout the entire interview." (R. 254). Contrary to her statements during the June 7, 2011, visit, Plaintiff on September 26 stated the epidural she received in May did help, and she was scheduled for another the following day. Dr. Maddox declined to give her any trigger point injections and indicated that if the epidural does not provide lasting relief, an MRI of the lumbar spine would be the next step, "as she has not had one in a year and her symptoms seem to have changed." (R. 254).

Plaintiff was seen at Prime Med on November 9, 2011, and she complained only of muscle pain and weakness and back pain. (R. 272). Her exam revealed low back pain. She was diagnosed with anxiety state not otherwise specified, chronic pain syndrome, lumbago, and sciatica. (R. 274). She received an injection of Prednisone; prescribed Ibuprofen, Ultram, and Zanaflex; and several tests were ordered, including an MRI. (R. 274-75).

Plaintiff saw psychiatrist Shakir Meghani, M.D., on October 27, 2011, and November 17, 2011. (R. 262-63). She told him she was going through a lot of changes. (R. 263). Her exam was normal, and he diagnosed her with ADHD and anxiety. (R. 262-63). She reported that she was taking Adderall and Xanax, and he continued those medications. (R. 263).

Plaintiff underwent her second MRI on November 16, 2011. (R. 257). The MRI showed minimal narrowing of the L4-5 intervertebral space with desiccation of the disk; bulging of the L3-4 disk to the left with encroachment of the left neuroforamen; midline herniation of the L4-5 and L5-

S1 disks without encroachment of the neuroforamina or spinal canal; and inflammatory changes of the apophyseal joints on the right at the L2-3 level and bilaterally at the L3-4 and L4-5 levels. (R. 257). At Plaintiff's December 9, 2011, visit at Prime Med, David Williams, M.D., noted that Plaintiff's MRI showed several changes from the previous MRI, and he referred to her neurospine. (R. 278). Plaintiff returned to Prime Med on January 6, 2012. (R. 396-99). Her medications were continued, but her lumbar epidural injection was delayed until after her appointment with the neurospine specialist. (R. 398).

On January 12, 2012, Plaintiff saw D. Bruce Woodham, M.D., at NeuroSpine Center. (R. 400). Plaintiff complained chiefly of back and neck pain, with constant low back pain, constant neck pain, and some bilateral hip and leg pain. (R. 400). She reported having "neck pain since she was a child. She has had back pain for a long time, and she is applying for disability because of these aches and pains." (R. 400). Dr. Woodham noted that Plaintiff was taking Adderall and Xanax from her psychiatrist, and he wrote that Plaintiff's mental status was alert and oriented to time, place, and person; her speech was fluent and normal; with no ideations. (R. 400). Her physical examination was normal. (R. 400). Her neurologic examination showed intact cranial nerves; intact sensory to light touch and pinprick, proprioception; symmetric reflexes and no pathologic reflexes; normal finger-nose-finger testing, without ataxaia. (R. 400). Her motor testing showed giveaway weakness, and her spine exam showed limited range of motion in the lumbar spine. (R. 400). Dr. Woodham noted that Plaintiff's past epidurals helped. (R. 401). He recommended she return to the pain clinic for treatment and evaluation, possible facet joint injections, epidural injections, "and those kinds of things." He added, "I don't see a role here for neurosurgery, and I have not made any claim for her disability." (R. 401).

13

On February 6, 2012, Plaintiff was seen at Prime Med for complains of back pain and assessed with anxiety state not otherwise specified, lumbago, sciatica, and spasm of muscle. (R. 389-92). The notes refer to her appointment at the NeuroSpine Center, and it appears her care provider did not realize she already had been seen. (R. 391). Other than her back pain, her exam results were normal. (R. 391). She was prescribed Ibuprofen, Ultram, Zanaflex, Lisinopril, Zantac, Neurontin, and referred to obstetrics and gynecology. (R. 391-92). Plaintiff presented to the Dale Medical Center on February 24, 2012, for anxiety. (R. 328).

The medical records show Plaintiff next presented to the Dale Medical Center on November 16, 2012, for a missed abortion. (R. 333, 340-53, 419-39).[7] During her visit in November 2012, with gynecologist Paul Dulaney, M.D., he reported, among other things, that Plaintiff's exercise level was moderate, but her general stress level was high. (R. 342). He prescribed antibiotics and Depo-Provera. (R. 342). On November 27, 2012, she received an ultrasound after complaining of pelvic pain. (R. 353). Kenneth J. Richardson, M.D., reported his impression was an "involuting cyst on the right ovary with adjacent peri-adnexal fluid. This would be consistent with a recently ruptured follicle." (R. 353).

On January 22, 2013, after the hearing in this case, Plaintiff presented to the Dale Medical Center seeking treatment for bilateral wrist pain, swollen fingers, and low back pain. (R. 415). Plaintiff reported generalized myalgia and arthralgia, swelling and stiffness in her fingers and wrists that had been progressively worsening for the past six years, and morning stiffness lasting more than

---

[7]Plaintiff testified "I was pregnant, but I wasn't pregnant. Apparently I was for a short time . . .[a]pparently it just couldn't survive or I don't know if my body rejected it . . . so I had to go for antibiotics . . . make sure everything was gone . . . ." (R. 70-71). Plaintiff's November 2012 medical records, however, also record she "[h]ad an elective ab 2 months ago in Montgomery . . . ." (R. 341).

forty minutes. (R. 415). Other notes indicate morning stiffness lasting a few hours. (R. 410). The notes also indicate headaches, muscle spasms, hot shower gives some relief and she has three to six showers or baths a day, some memory loss, excessive worry, anxiety, depression, and difficulty falling or staying asleep. (R. 410). Plaintiff listed thirteen different medications she had taken, and that she currently was taking Tramodol, Ibuprofen, Depo shots, Xanax, Adderall, and Zoloft. (R. 411).

On February 6, 2013, Plaintiff saw rheumatologist In Young Soh, M.D. (R. 403-05, 418). Dr. Soh reported that Plaintiff "still continues to have generalized body aches. (R. 403). Contrary to Plaintiff's testimony that her blood was positive for rheumatoid arthritis (R. 65), Dr. Soh reported that "[w]orkups for connective-tissue disease has not been productive. RA factor was negative, ANA was negative" and "sedimentation rate is normal." (R. 403). Plaintiff revealed to Dr. Soh "a long history of depression and anxiety possibly originating from the murder death of her mother 15 years ago." (R. 403). Plaintiff stated that a nurse practitioner at her psychiatrist's office told her Zoloft 25 mg per day would be sufficient, but she had been taking it for a month without significant benefit. Plaintiff stated to Dr. Soh that she felt depressed and cried quite frequently, and she continued to have insomnia and generalized body pain. (R. 403). Dr. Soh's physical exam revealed normal neurological results, no muscle tenderness, no atrophy, 5/5 muscle strength, no swollen joints, no crepitation, range of motion within normal limits, but most of the joints were tender to the touch. (R. 403-04). Dr. Soh diagnosed Plaintiff with fibromyalgia syndrome with significant underlying depression and anxiety, and Plaintiff was advised to see Dr. Lopez in psychiatry. Dr. Soh stated "[t]here is no active connective tissue disease at present time." (R. 404).

2.    **Dr. Meadows**

15

About seven months later, Dr. Meadows saw Plaintiff on September 10, 2013, and she complained of depression, wrist and hand pain, and back pain. (R.17). Plaintiff reported that she had been treated for depression "for years." (R. 17). Plaintiff reported her medications included Zoloft, Xanax, Adderall, Topiramate, Ultram, Gabapentin, Ambien, Trazodone, DepoProvera, and multivitamins. (R. 18). Dr. Meadows described Plaintiff as "anxious appearing and somewhat distracted at times. . . . 'high strung' in appearance and jittery." (R. 18). Her back was tender to palpation over the lumbar-sacral spine, and she had lumbar and sacroiliac joint tenderness, but a seated single leg raise was negative to 90 degrees on both legs, and her deep tendon reflexes were 2+ symmetrical. (R. 18-19). Plaintiff complained of pain with mild palpation of the lower back. (R. 18) Plaintiff had a full range of motion, though she complained of pain with range of motion in her wrists. She walked with a tandem gait and was able to toe and heel walk. She could squat and rise without difficulty. (R. 18). Her strength in upper and lower extremities was 5/5 on both sides. (R. 18). She had no edema and normal peripheral pulses. (R. 18). She had positive Tinel's test on her right side. (R. 19). Dr. Meadows reported that Plaintiff was alert and hypervigilant, and on several occasions Plaintiff was talking to herself. (R. 18). She heard distant thunder at one point and became very apprehensive. (R. 18-19).

Dr. Meadows assessed Plaintiff primarily as having an unspecified backache; degeneration of the lumbar or lumbosacral intervertebral disc; joint pain in the ankle and foot; obsessive-compulsive disorder; anxiety, unspecified; depressive disorder not elsewhere classified; carpal tunnel syndrome;  chronic migraine without aura, without mention of intractable migraine, and without mention of status migrainosus; and rheumatoid arthritis. (R. 19). In his plan for the "unspecified backache," Dr. Meadows indicated Plaintiff "seemed distracted and I am hopeful further information

16

and [treatment] may be rendered by Dr. Lopez. It seems to me that this would be of most benefit to her." (R. 19). Dr. Lopez is a psychiatrist. (R. 263).

Dr. Meadows gave the opinion that Plaintiff could generally lift, carry, sit, stand, and walk sufficiently to perform light work,[8] but her pain and the side effects of her medication would prevent her from completing that work. (R. 18-26). Dr. Meadows indicated in a Medical Source Statement that, among other things, Plaintiff could frequently lift and carry up to 20 pounds, sit up to 6 hours in a workday, sit up to 4 hours at a time, and stand and walk up to 2 hours at a time and during an 8-hour workday. (R. 21-26). He indicated Plaintiff did not need a cane to ambulate. (R. 22). Dr. Meadows completed an assessment of Plaintiff's pain. (R. 20-22). He indicated pain for Plaintiff is present to such an extent as to be distracting to adequate performance of daily activities at work; that physical activity causes some increase in pain, but no so much as to prevent adequate functioning in walking, standing, sitting bending, stepping, moving extremities, and the like; and that Plaintiff's drug side effects could be expected to be significant and limit effectiveness of her ability to perform higher work. (R. 20).

The court concludes that Dr. Meadows's opinion raises new concerns not previously raised, and his opinion was not material to the ALJ's decision that Plaintiff was not disabled during the relevant time period. Dr. Meadows indicated that Plaintiff's medications cause side effects that

---

[8]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567 (b); 416.967(b).

prevent her from working. (R. 20). But Plaintiff's earlier medical records and testimony before the ALJ's decision on August 20, 2013, did not indicate any side effects of her medications, Dr. Meadows did not explain further how the medications affected Plaintiff, and even Plaintiff did not raise concerns about side effects of the medications to Dr. Meadows. (R. 17-18). Dr. Meadows's opinion that the side effects of the medications would prevent Plaintiff from working was not supported by his notes or the record as a whole. *See* 20 C.F.R. §§ 1527(c), 416.927(c) (evaluating medical opinion evidence). Furthermore, Plaintiff told Dr. Meadows about new medications not previously listed in her medical records, including Topiramate (an anticonvulsant used in treating migraines and bipolar disorder),[9] Ambien (a sleep aid),[10] and Trazodone (an antidepressant).[11] (R. 18). If Plaintiff began taking the medications after the ALJ's decision, and the side effects began after the ALJ's decision, they were not part of the relevant time period. *See* 20 C.F.R. §§ 404.970(b), 416.1470(b)); *see also Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir. 1999) (opinion given a year after the ALJ's decision not part of relevant time period). Dr. Meadows also included diagnoses not previously included and not raised by Plaintiff as a basis of disability, including obsessive-compulsive disorders, carpal tunnel syndrome, and chronic migraine. (R. 19). Thus, the evidence from Dr. Meadows does not relate to the time period under review by the ALJ. *See Wilson*, 179 F.3d

---

[9]Topiramate is the generic version of Topamox. *See* <https://vsearch.nlm.nih.gov/vivisimo/cgi-bin/query-meta?v%3Aproject=medlineplus&v%3Asources=medlineplus-bundle&query=ambien> (last accessed Jan. 15, 2016);

[10]*See* <https://vsearch.nlm.nih.gov/vivisimo/cgi-bin/query-meta?v%3Aproject=medlineplus&v%3Asources=medlineplus-bundle&query=ambien> (last accessed Jan. 15, 2016).

[11]*See* <https://vsearch.nlm.nih.gov/vivisimo/cgi-bin/query-meta?v%3Aproject=medlineplus&v%3Asources=medlineplus-bundle&query=trazodone> (last accessed Jan. 15, 2016).

at 1279 & n.5. Even assuming the evidence relates to a previously considered condition, evidence of a deteriorating condition is not relevant to the period of time under review before the ALJ. *See Thornton v. Comm'r, Soc. Sec. Admin*, 597 F.App'x 604, 615 (11th Cir. 2015) (citing *Wilson*, 179 F.3d at 1278-79).

As for Dr. Meadows's remaining opinion regarding Plaintiff's pain, the court will address it in connection with Plaintiff's other argument, infra, that the ALJ improperly applied the pain standard in Plaintiff's case.

### 3.    The ALJ's Mental RFC Assessment

At Step Two of the sequential analysis, the ALJ determined that Plaintiff did not have a mental impairment that met or medically equaled a listing. (R. 33-34). In doing so, the ALJ followed the psychiatric review technique required by the regulations. *See* 20 C.F.R. §§ 404.1520a , 416.920a; *see also Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005). The ALJ found that Plaintiff had mild restriction in activities of daily living; moderate restriction in social functioning; moderate restriction concentration, persistence, or pace; and there was no evidence of episodes of decompensation of extended duration. (R. 33). The ALJ based his findings on the medical evidence and Plaintiff's testimony.

Plaintiff testified she took care of her seven-year-old daughter, showers herself, dresses herself, does errands and drives probably less than thirty miles, prepares dinner, makes the bed, does dishes, laundry, vacuums, dusts, and helps out at school by making copies and going to donate blood. (R. 33, 58-59, 62, 68, 70). Plaintiff testified she did not like being around big rooms with crowds or new places, and she preferred places in her "comfort zone." (R. 33, 70). However, she also testified that she goes to church once and sometimes twice a week, attends her daughter's school activities,

does errands, and goes on girls night out or dates when her daughter is at her father's twice a month for visitation. (R. 33, 61-62, 70-74). Plaintiff testified she is distracted by her pain (R. 75), but she prepares for the day by focusing on what she has to do and relying on a "go list" she makes of what she has to do. (R. 33, 58-59, 70, 75). The medical records show that Plaintiff saw a psychiatrist in October and November of 2011 (R. 262-63), and she has been diagnosed and treated or referred to medical care for anxiety, ADHD, and depression. (R. 270, 301, 410-11, 403-04). At the January 2013 hearing, Plaintiff testified she last saw her psychiatrist on December 14, 2012, but she was having a hard time getting the medical records. (R. 37, 79-80).

The ALJ determined that Plaintiff cannot perform work requiring public interaction, and her deficits in concentration, persistence, or pace could cause her to be off task about five percent of the workday. (R. 34).

### 4.    Dr. George

Dr. George conducted a psychological evaluation of Plaintiff on September 24, 2013. (R. 12-16). Plaintiff reported to Dr. George that she is nervous, anxious, and avoids people. (R. 12). She said her problems became worse after her daughter was born. (R. 12). Plaintiff stated that she repeatedly was sexually abused, beginning at age 6, and that currently she has flashbacks and nightmares to the events, is hypervigilant and hyperalert, has an exaggerated startle response, and gets very upset when something reminds her of her trauma. (R. 12). Plaintiff stated that since middle school, she experienced difficulty zoning out and paying attention, and she rated herself as having seven of nine symptoms of inattentiveness. (R. 12). Since her mother passed away when Plaintiff was 13, she has experienced excessive and chronic worry, constantly feeling restless, on edge, easily fatigued, muscle tension, and sleep difficulties. (R. 12). She indicated that when her mother died she

did not believe her mother died, even though Plaintiff attended her funeral. (R. 12). She reported that for the last several years, she has had a depressed or irritable mood all day, every day, with reduced pleasure in activities, decreased appetite, fatigue, lower energy, feelings of worthlessness and low self-esteem, decreased activity, decreased drive, decreased productivity, and ongoing trouble falling asleep, staying asleep, and having restless sleep. (R. 12). Plaintiff told Dr. George that she did not consider or attempt suicide because of her daughter. (R. 12). She reported that throughout her life she has experienced twenty other episodes of depression lasting two or more weeks, occurring nearly all day, almost every day. (R. 12). Plaintiff reported that for the past several years she has experienced panic attacks with rapid heartbeat, sweating, trembling, shortness of breath, chest pain, fatigue, dizziness, and lightheadedness during which she feels she is losing control. (R. 12). Plaintiff reported that for the last six years, she has had obsessive thoughts and compulsive behaviors, and they worsened four years ago. (R. 12). She stated she spends four to six hours each day (and six to eight hours on stressful days) cleaning, hand washing, and organizing; that she gets very upset if her things are moved; and she uses only her own bathroom because she keeps it sanitized. (R. 12). Plaintiff reported she feels like she does not have a connection with her daughter. (R. 12). As part of her daily activities, Plaintiff said she sleeps five hours a night, fixes two meals a day, does light housework for short periods of time, listens to music, rests, and talks on the phone. (R. 15). She reported she less frequently does laundry, goes to church, shopping, and watches television. (R. 15). She reported organizing, cleaning, and arranging several hours a day, leaving the house several times a week to run errands and do what her daughter needs. (R. 15). She reported seeing her boyfriend and daughter on a regular basis. (R. 15). Dr. George stated that Plaintiff's "daily activities appear to be significantly restricted and her interests and relationships severely constricted." (R. 15).

On a neurological symptoms checklist, Plaintiff reported blurred vision; tremors or shakiness; wrist, back, and neck pain; headaches; and difficulties with memory, thinking clearly, thinking quickly, remembering the right word when talking, and understanding others. (R. 12). Plaintiff reported seeing a Dr. Essenberg in Dothan for several years as well as having prescriptions for Zoloft, Xanax, Topamax, and Adderall; when she was told there is no Dr. Essenberg in Dothan but there is a Dr. Esin, Plaintiff said Dr. Esin was her psychiatrist. (R. 13).

Dr. George reported that Plaintiff's personal hygiene was good, she was appropriately dressed and groomed, and she had colorful tattoos on both arms. (R. 13). He reported that her activity level and speech were accelerated; that she was highly anxious and trembled on and off throughout the interview. (R. 13). When she initially saw the office, Plaintiff became highly anxious and stopped at the door for a minute or two, indicating she did not think she could come into the room because it was so disorganized and messy. (R. 13). Dr. George reported that Plaintiff's range of affect was restricted, and that while she was highly anxious and tearful when discussing her past abuse, her affect otherwise was not unstable or inappropriate. (R. 13). Dr. George reported that Plaintiff's attention and concentration appeared significantly impaired, as she was able to perform only one serial of five correct serial 7s without using her fingers. (R. 13); 20 C.F.R. t. 404, subpt. P, app. 1, 12.00(C)(3) (assess concentration by tasks such as counting backwards from 100 by 7s). He reported that her immediate and recent memory appeared intact, but her remote memory appeared significantly impaired. (R. 13). For example, she could not remember the names of several doctors she saw multiple times. (R. 13-14). Dr. George reported that Plaintiff's fund of information about the environment was impaired, as she knew how many months are in a year and who Martin Luther King was, but she did not know in which direction the sun rises or how many weeks are in a year.

(R. 14). Dr. George reported that Plaintiff's verbal conceptual thinking appeared limited; her performance on both information questions and similarities was highly inconsistent, missing relatively easy ones while getting more difficult ones correct. (R. 14).

Dr. George administered the MMPI-II, which suggested several possibilities: Plaintiff was "emotionally disorganized as a result of severe anxiety and depression or a thinking disturbance, exaggerating her difficulties as a cry for help; or deliberately answering questions incorrectly." (R. 14). Dr. George's opinion was that the first alternative, severe anxiety and depression, was correct. (R. 14). Dr. George gave the opinion that Plaintiff had significant emotional disorganization caused by severe anxiety and depression, and serious difficulties coping day-to-day. (R. 14). In addition, Plaintiff reported somatic symptoms. (R. 15). She reported unusual thinking and experiences, such as believing her soul left her body, seeing things that others do not see, feeling as if things are not real, peculiar odors, and hearing strange things when she is alone. (R. 15).

Dr. George assessed Plaintiff as having prolonged posttraumatic stress disorder; major depression, multiple episodes, severe with psychotic features; generalized anxiety disorder; panic disorder; obsessive compulsive disorder; and attention deficit disorder not otherwise specified with features of inattention. (R. 15). Dr. George reviewed and considered the medical evidence provided by the DDS. (R. 15). He noted that Plaintiff reported she had rheumatoid arthritis, migraines, and back/neck/joint pain, but that Dr. Soh reported no rheumatoid arthritis and that Plaintiff instead had fibromyalgia syndrome and lower back pain secondary to degenerative joint disease. (R. 15). Dr. George felt Plaintiff could manage her own funds and live independently, but because of her medical difficulties, anxiety, and depression, she may require some assistance in those areas of her life requiring interaction with the outside world. (R. 15). Dr. George gave the opinion that Plaintiff could

23

understand and remember job requirements in many skilled and service occupations, but her attention difficulties and severe anxiety would cause her difficulty in carrying them out. (R. 16). He gave the further opinion that Plaintiff's extreme anxiety and depression, as well as her compulsions and obsessions, would make her unable to respond to coworkers and supervisors and to cope with job stresses and job changes in the work environment. (R. 16).

Plaintiff argues that based on Dr. George's opinion she could not do even unskilled work, as defined in Social Security Ruling 85-15. P's Br. (Doc. No. 12) at 10; *see also* SSR 85-15, 1985 WL 56857, at *4 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.").

The court concludes that Dr. George's opinion concerns matters not chronologically relevant or material to the ALJ's decision. Dr. George diagnosed Plaintiff with new disorders not previously claimed or diagnosed, including posttraumatic stress disorder, panic disorder, obsessive-compulsive disorder, and he added psychotic features not previously part of Plaintiff's depression diagnosis. (R. 15). Plaintiff previously did not report obsessive behaviors or hallucinations, and it is evident Dr. George found these specific conditions, when combined with those impairments known to the ALJ, essential to his opinion that Plaintiff "would be unable to respond to coworkers and supervision and to cope with job stresses and job changes in the work environment." (R. 16). Plaintiff told Dr.

George she was taking Topamax for migraines (R. 13), but she did not allege disability based on migraines, her medical records in the file do not show it or a prescription for Topamax or Topiramate. (R. 49-50, 187). Thus, the evidence from Dr. George does not relate to the time period under review by the ALJ. *See Wilson*, 179 F.3d at 1279 & n.5. Even assuming the evidence is of a previously considered condition, evidence of a deteriorating condition after the ALJ's decision is not relevant to the period of time under review before the ALJ.  *See Thornton*, 597 F.App'x at 615 (citing *Wilson*, 179 F.3d at 1278-79).

### B.       *Whether the ALJ Failed to Apply the Applicable Pain Standard*

Plaintiff argues she has an underlying medical condition that could reasonably be expected to produce her pain. Pl.'s Br. (Doc. No. 12), at 15. The Court of Appeals for the Eleventh Circuit has articulated its "pain standard," governing the evaluation of a claimant's subjective testimony about pain, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). "Thus, the ALJ must determine: first, whether there is an underlying medically determinable impairment that could reasonably be expected to cause the claimant's pain or other symptoms; and second, the intensity and persistence of the symptoms and their effect on the claimant's work." *Himes v. Comm'r of Soc. Sec.*, 585 F. App'x 758, 765 (11th Cir. 2014) (citing 20 C.F.R. § 416.929(a), (c)). The ALJ evaluates the "claimant's subjective testimony of pain" only after the claimant satisfies the first and one of the alternate portions of the second prong of the pain standard. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir.

1995).The Eleventh Circuit has explained that, "in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." *Id.* at 1561. Importantly, it is only evidence of the underlying condition which could reasonably be expected to cause pain, not evidence of actual pain or its severity, which must be presented by the claimant to satisfy the "pain standard." *Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991); *see also Foster v. Heckler*, 780 F.2d 1125, 1129 (4th Cir. 1986); *Hill v. Barnhart*, 440 F. Supp.2d 1269, 1272-73 (N.D. Ala. 2006). After making these determinations, the ALJ must then proceed to consider the claimant's subjective testimony about pain, and the ALJ's decision to reject or discredit such testimony is reviewed for substantial evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992). If the ALJ finds the claimant's subjective testimony not credible, the ALJ "must articulate explicit and adequate reasons for doing so," and failure to do so "requires, as a matter of law, that the testimony be accepted as true." *Wilson*, 284 F.3d at 1225. Factors to consider in evaluating the intensity and persistence of pain include daily activities; the location, duration, frequency, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication to alleviate pain; treatment, other than medication, for pain relief; other measures used to relieve; and any other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ reviewed Plaintiff's testimony regarding her pain. (R. 35-37, 51-79). He found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [Plaintiff's] statements concerning the intensity, persistence and limiting effects of the symptoms are not consistent with the record" or the RFC he determined. (R. 37). The ALJ then recounted Plaintiff's medical treatment, which included many normal or mild findings. In April

26

2011, Dr. Maddox wrote Plaintiff was "a thin, fit patient who should do well wit[h] her back." (R. 256). Plaintiff's notes from May 2011 indicate she was "an excellent candidate for conservative care using manual therapy." (R. 247-48). She gave contradictory indications regarding the effectiveness of injections. (R. 254-55). In January 2012, Dr. Woodham at NeuroSpine Center examined her and determined that Plaintiff had "some minimal lumbosacral degenerative disc disease," but her physical examination was normal, and he recommended she return to the pain clinic for treatment and possible joint and epidural injection, but he did not "see a role here for neurosurgery." (R. 400-01). Contrary to Plaintiff's testimony of joint swelling and rheumatoid arthritis (R. 57, 65, 74), the ALJ observed that in February 2013, rheumatologist Dr. Soh found no swelling, normal range of motion, negative RA factor, and that Plaintiff had "no active connective tissue disease." (R. 37-40, 404). The ALJ also relied on Plaintiff's testimony regarding her activities of daily living that are inconsistent with the degree of limitation Plaintiff claimed, "including taking care of her personal needs, as well as her daughter's needs; doing laundry; preparing meals; performing household chores; going grocery shopping, and; driving." (R. 40). The ALJ also relied on Plaintiff's "conservative treatment . . . including no hospitalizations or recent ER visits . . . ." (R. 40).

Plaintiff argues that doing everyday activities of short duration, such as "'housework, light cooking, and light grocery shopping are minimal daily activities' and 'are not dispositive evidence of one's ability to perform sedentary work in a Social Security case.'" Pl.'s Br. (Doc. No. 12), at 19 (quoting *Venette v. Apfel*, 14 F. Supp. 2d 1307, 1314 (S.D. Fla. 1998); *see also Lewis v. Callahan*, 125 F. 3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" did not disqualify a claimant from disability and was not inconsistent with the limitations recommended by the treating physicians" regarding the claimant's ability to work).

Plaintiff, however, does more. She testified she goes to church once or twice a week, attends teacher conferences and a school blood drive, does errands up to within thirty miles, does laundry and vacuuming, goes to mother and daughter day, socializes with friends, and dates when her daughter is with her father. (R. 60-62, 71-73). Moreover, the ALJ's determination of Plaintiff's credibility was made in the context of her allegations that her pain level is a ten out ten of ten for about half the day; that she cannot lift the garbage lid to put out the trash; she can walk, with a limp, for only five minutes; stand for about five minutes; sit at a computer about ten minutes, spends about six hours a day taking breaks, hot showers, and propping herself up on a heating pad so she can fall asleep, but does not feel pain when she sleeps. (R. 57, 60, 75-78).

The ALJ gave "explicit and adequate reasons" based on the objective medical evidence and other evidence of record that sufficiently indicate he considered Plaintiff's medical condition as a whole in making the credibility determination. *See Dyer v. Barnhart*, 395 F.3d 1206, 1212 (11th Cir. 2005) (holding ALJ made a reasonable decision to conclude a claimant's "subjective complaints were inconsistent with his testimony and the medical record" after considering claimant's "activities of daily living, the frequency of his symptoms, and the types and dosages of his medications"). Viewing the evidence as a whole, taking account evidence favorable as well as unfavorable to the decision, the court concludes the ALJ did not err in his determination as to Plaintiff's credibility regarding her pain.

To the extent Plaintiff argues that Dr. Meadows's opinion would alter the outcome of the ALJ's decision regarding her pain, the court concludes that it would not. Pl.'s Br. (Doc. No. 12), at 7-8, 10-11, 17. Dr. Meadows indicated pain for Plaintiff is present to such an extent as to be distracting to adequate performance of daily activities at work; that physical activity causes some

increase in pain, but not so much as to prevent adequate functioning in walking, standing, sitting

bending, stepping, moving extremities, and the like. (R. 20). In this regard, Dr. Meadows's

assessment is less limiting than Plaintiff's assertions. In addition, the court notes, Plaintiff indicated

she began using a cane to ambulate in December 2011, and she used one at the hearing, but Dr.

Meadows wrote that Plaintiff did not need a cane. (R. 22, 62, 203). There is not a reasonable

possibility that Dr. Meadows's opinion would change the administrative outcome. *See Washington*,

806 F.3d at 1320.

## VI.    CONCLUSION

The court has carefully and independently reviewed the record and concludes that, for the

reasons given above, the decision of the Commissioner is AFFIRMED. A separate judgment will

issue.

DONE this 24th day of February, 2016.


/s/ Wallace Capel, Jr.
UNITED STATES MAGISTRATE JUDGE